Roy. Good morning, Your Honors. Michelle Jochner on behalf of the Apollant, David Heroy. Good morning, Your Honors. Leanne Finkel and Piers Fulton with Berger-Shaxx on behalf of the Apolline Donahue-Tuke. Thank you, Counsel. Whenever you're ready, Ms. Jochner. Good morning, Your Honors. Justices Cunningham, Harris, and Connors. May it please the Court, again, my name is Michelle Jochner and I am here with Co-Counsel Karen Schatz. We are with the law firm of Shuler-Ducanto Inflect and we represent the Apollant in this matter, David Heroy. And I would like to reserve a few moments for rebuttal, please, Your Honor. Thank you for allowing us to discuss with you why we are appealing what, at first glance, may appear to be a favorable ruling to Mr. Heroy. Indeed, the Circuit Court confirmed that he had a valid basis for his request to modify Ms. Tuke's maintenance in that he met his burden of proof pursuant to Section 510 of the IMDMA to establish a substantial change in circumstances. Namely, that his income had declined by nearly 30 percent since entry of the 2006 dissolution judgment, a decrease acknowledged by experts presented by both sides. Ms. Jochner, are you questioning that the Court should have reduced the amount more, or what exactly is your beef with the amount that the Court reduced the maintenance? Your Honor, what we are doing is asking that this Court reverse the judgment of the Circuit Court and remand this for further proceedings so that the Circuit Court can actually apply and appropriately construe the applicable statute here, which is Section 510 of the IMDA, which applies Ms. Jochner, if you look at the amount according to, there is something in the transcript to suggest that the trial court took all of the points that you raised in your brief into consideration and said that he felt 25 percent or so was an appropriate amount. And the amount of money that's awarded approximates what the trial court suggested. What's wrong with that? Well, Your Honor, when we did talk about this in our briefs, that we do believe that, first of all, that the number that was actually given by the trial court, the 27-5, which was the reduction, was a mathematical and calculation error. As we set forth in our brief, we do believe that 25 percent of the total cash flow, as noted by Ms. Tukey's expert, Mr. Newman, would be $25,745. I note that most of the response from Ms. Tukey in her brief to this is in a footnote. And as Your Honors may recall, that that was one of the objections that we had overall to Ms. Tukey's brief, was that there were a lot of substantive arguments which were contained within footnotes and which violate many of this Court's rules. For the footnote problem, it's 341A and also violates this Court's pronouncements and technology solutions. And I direct you to page 382 and 383 of that. Your Honors, since we're talking about footnotes, if what is incorporated in all of those footnotes in this brief and there are six lengthy sets of footnotes, if those would have been exceeded, if they would have been included in the text of the brief as mandated by technology solutions, as this Court said, Ms. Tukey's brief would have exceeded the page limit mandated by Rule 341 and violated yet another Court rule in addition to the ones that we set forth in our brief. What does that have to do with the amount of money, though? That's what I'm focused on. How much money are you contending the Court, or do you think we should throw out the whole thing and start over? Well, Your Honors, as you are aware, in this case, the Circuit Court entered two separate orders. The first one was the original order on modification. And as you may recall, in that modification order, that the Circuit Court said that the sole basis for the reduction in Ms. Tukey's maintenance was Mr. Heroy's decrease in income, again, which was agreed to by both sides. On reconsideration, we raise the issue of that the Circuit Court said that it could not look at the other factors in 510, although 510 itself specifically looking at the plain language of that statute, 510 specifically says that in modifying maintenance in all such proceedings, 510 does not distinguish between permanent maintenance or any kind of reviewable maintenance. The statute does not give different rules for different types of maintenance. And of course, one of the basis of statutory construction, one of the cardinal rules, is that you cannot read into statutes any exceptions or limitations which are not there. So 510 applies. 510 says in all such proceedings, the Court shall consider the following factors. And in 2, it says the efforts of any made by the party receiving maintenance to become self-supporting and the reasonableness of the efforts where they are appropriate. And here, the Court, aside from being mandated under the very plain language of the statute, in addition, the Dissolution Court at page 40 of its judgment stated that a review of this sort to look at Ms. Tukey's reasonableness of her efforts in becoming self-sufficient was appropriate because, quote, that court at page 40 of the dissolution judgment stated that Ms. Tukey may, quote, be able to gain skills in a few years to earn a greater salary. And I Ms. Drostner, if I understand you, you're saying that we have to throw out the whole thing because it's really not based on anything that's supported by the record because Ms. Tukey did not make any reasonable efforts to become self-sufficient. And I'm not sure that that's true. And I'm not sure that Ms. Tukey did not make any reasonable efforts to become self-supporting. Is that your argument? Your Honor, as I was attempting to explain, in the second, in the reconsideration order, we went back and we highlighted to the circuit court that it had only solely based the modification upon Mr. Heroy's decrease in income. And upon modification, I'm sorry, upon re-hearing, the court found that Ms. Tukey had made attempts to earn income, if you look at page 7 of the reconsideration order, and that she attempted to rehabilitate by admitting that her efforts to turn alert, which was valued at zero and has been a money-losing enterprise for basically 80% of the time that it's been in existence for the past 30 years. And Ms. Tukey testified that she poured $160,000 into this money-losing enterprise to help her to get her job back. And that's not the only issue. So I want you to give me, succinctly, your best argument as to why we ought to do what you're asking us with respect to the modification of the permanent maintenance. Your Honors, aside from the plain language in Section 510, which mandates that the circuit court must look at this, and again, on reconsideration, the circuit court said that he looked at that but said that she had made attempts but never made the finding that those attempts were reasonable. If you look at page 7 of the modification order, that was never made. In turn, also based upon interpretive case law, which requires that all recipients of maintenance, whether they be permanent or recipients of reviewable maintenance, make efforts to try. And this court itself found in the in-ray marriage or KunixConnect case that operating a money-losing business is not a reasonable effort under Section 510, and also under a fair reading of the dissolution judgment at page 40, which envisioned that Mrs. Tukay would make reasonable efforts to develop additional skills. And again, in the reconsideration order, the circuit court went back and said, well, I find that she does make some attempts, but that's not the standard which is set forth in Section 510. Does the court have to say these attempts were reasonable? Does the court have to say that magic word or not? Well, Your Honor, we are all aware of case law in the dissolution context which says that a court does not necessarily have to do that. But when the court only talks about one half of the equation here, we feel that there is an error. There is an error in law and also that there is an abuse of discretion at the same time. How long was this hearing? How many days of hearing? It was 21 days of hearing. And we assume that the trial court knows the law. And this is an experienced trial judge here. And the fact that he didn't actually make that statement that it was reasonable, again, that's your basis for saying it should be. Oh, let me ask you this question. What's the standard of review? The standard of review here, we contend that the standard of review here is de novo because the trial court here failed to apply and properly construe a statutory directive and that's an error of law. So, you don't think it was abuse of his discretion? Your Honor, our position is that de novo review is appropriate here. But even if we apply abuse of discretion, we believe that there was an abuse of discretion here at the same time because no reasonable person could adopt the view that the trial court did, that what Ms. Choucay did here was reasonable under the circumstances. Plowing in $160,000 into a money losing business that was valued at zero and the trial court did not apply. And that in her trial testimony herself, that she testified that she was loaning money to alert to keep it going and she admitted that her loan to alert was money that she probably had lost forever. And I direct you to Volume 13, page 10 of the record for this. This is not a reasonable effort under the mandate of the statute. And again, your own, your Honors have already decided this in In Re Marriage Clinics Connect and also In Re Marriage of Verde, which is a very recent case from the 3rd District, which both stand for the proposition that the IMDMA does not contemplate that the payer should subsidize a payee's failing business. And I note, your Honors, again, talking about the footnote problem in Ms. Choucay's brief, Ms. Oteke's response to the Clinics Connect case is contained entirely within a footnote. And again, that response itself is totally unresponsive because it does not speak about the legal issue. Counsel, was that case a de novo review or abuse of discretion? That case it was looking at a factual finding. Right. So this case is not looking at a factual finding? This case, this case is looking at, we are saying that there is an error of law because the trial court failed to apply the appropriate statutory considerations. But at the same time, if your Honors disagree with us on this, that we believe in any event that there is a, that there is abuse of discretion here. So no reasonable person could have decided as the court decided here is what you're saying? That is correct. We're looking at all the facts that are presented here, your Honor, as to what was done and not done during this time for Ms. Choucay is so very highly educated. And actually what the dissolution court said here at page 40 of its order, saying that it expected that Ms. Choucay would make more efforts. And that again, that is something that is not addressed in the appellee's brief. And I think that that's a very, very important thing is that there was contemplation by the court at dissolution that she would make some efforts to do this. And the trial court stated it in its opinions. And again, as I stated, the entire, the entire response to this is in a footnote. It doesn't address. Can we move on to another issue? Do you have a question regarding this? Let's talk about the attorney's fees. Yes, Your Honors. What's the standard review in that regard? Again, Your Honors, we contend that it's de novo because there's an error of law in ordering Mr. Heroy to contribute $160,000 to Ms. Choucay's attorney's fees. Why would that be an error of law? Because the court did not apply In re Meritus Schneider, which is a controlling Illinois Supreme Court case, and under stare decisis, it was required to do so. So not applying a case as precedent makes a matter de novo review? Your Honor, we cite in our brief Townsend v. Sears-Robach that says selection, interpretation, and application of legal precepts. If that's done incorrectly, then that is, it subjects the court's ruling to de novo error, to de novo review. I'm sorry. Well, for the moment, let's assume that it's a discretionary error standard review. Can you articulate for me where in the trial court made a mistake in awarding the attorney's fees? Yes, Justice Harris, I can do so. The trial court stated that it applied Schneider's inability to pay analysis, but the very fact that it ordered Mr. Heroy to have contribution to Ms. Choucay's fees in the amount of $160,000 belied that statement. Your Honors, actions speak louder than words. What the court did here was use a comparative ability to pay analysis rather than an inability to pay analysis. And this is shown by two things, which were two main things which were in the record, which showed that she did not have an inability to pay her fees. The first is that Mrs. Choucay had already paid the majority of her fees generated by the modification proceedings. The record revealed that she had paid $379,000 in fees by the time she filed her petition for prospective appellate fees in March 2013. And that's at our appellant's brief at page 20, referring to Supplemental Volume 4, pages 11-12. Ms. Doudna, specifically, what's the criteria that the court must apply in determining whether Mr. Heroy must pay Ms. Choucay's attorney's fees? What's the criteria? Just outline it for me. Not a long argument, just bullet points. What's the criteria? The criteria is an inability to pay, and Schneider defined that as stripping the payee of her means of support and undermining the payee's financial stability. And your argument is that based on the assets that Ms. Choucay has, that they were not able to show that they did not show that there was an inability to pay. Whose burden of proof is it? The burden of proof on her. She is the one who is coming to court to ask for a contribution from Mr. Heroy. And so you're contending that she did not show that she had an inability to pay, but the trial court ordered Mr. Heroy to pay anyway. That is correct, Your Honor. That is correct. We believe that the facts, again, showing that she already paid the majority of her fees, and we cite to In Re Marriage of Manti, which said that showing the ability to pay, that it shows the ability to pay by already having paid one half of the fees incurred. And I note that in her brief, Ms. Choucay does not address this, that she had already paid the majority of her fees. And in addition, Your Honors, I also note that Ms. Choucay voluntarily reduced her liquid assets by more than $1.5 million, and we submit that in doing so that she gained the system in the process by voluntarily converting $504,000 in liquid assets into home equity by prepayment of her mortgage, $300,000 of $4,000 of which occurred after Mr. Heroy filed his modification proceeding. The trial court, in both its original order and at reconsideration, found that prepayment of a mortgage is reasonable. And, Your Honors, we have no quarrel with that statement in the abstract. What the problem is here is that it misses the point when it's applied to the facts here. The facts suggest that this was done to artificially reduce her liquid assets for the purposes of the fee contribution petition. How do we know that, Counsel? Well, we can look at what she testified to. She testified at Volume 10, page 193, that plowing this money, this $500,000, into her residence was, quote, an investment choice, end quote, in lieu of depositing it into a liquid investment account. Well, again, so did she say, I did this because I want to avoid, this is an issue with my fees that may come up in this case? Well, Your Honors, she also testified that when she prepaid the mortgage that she knew that the litigation was pending and she already was receiving attorney bills. And that's at Volume 13, page 105. And what this does, by allowing, by the circuit court saying that it was reasonable for her to prepay her mortgage, we don't quarrel with that in the abstract. It's under the specific facts that were here. What this did, the effect of her taking this money and putting it at the time that she was receiving bills and knowing that she would be responsible for them, that it unfairly insulated this money from her own fee payment. And the trial court failed to address the specific issue of whether this cash movement was problematic. It just said, well, I believe that her prepayment of the mortgage was reasonable. And again, that's not the issue. Did she specifically ask those questions at hearing? Why did you do that? And as I said, Your Honor, that's why I'm taking that testimony. And again, to find, it really, it smacks of gamesmanship to move $304,000 of assets after you are in litigation into this kind of illiquid vehicle and during a pending proceeding and affirming this ruling would allow the maneuver to really enter the divorce playbook. How much, Ms. Tuca is currently getting, $27,500 a month in maintenance payments? That is correct, Your Honor. That is correct, Your Honor. Well, the trial court, you know, this manipulation of paying off the mortgage, it's alleged manipulation. The trial court, after lengthy hearings, did deem that her actions were reasonable and that by prepaying the mortgage, she substantially decreased her monthly expenditures. Who is in a better position to determine the question of fact in that regard? Well, Your Honor, I... After 21 days of hearings, I would think that the learned judge below didn't treat this matter lightly. Where was his mistake? Well, again, Your Honor, we believe that the circuit court's ruling here was an abuse of discretion because under these specific facts, he only spoke in his rulings to the fact that there was, that her prepayment of this mortgage was reasonable and didn't go further, once again, to address... Did the court make a finding regarding whether payment of her attorney's fees would undermine her financial stability? And if so, based on what? In the court's ruling, the court said that... I believe that the language was used that the court believed that she had made a good argument that she had shown that she had an inability to pay. And he looked at the different... Did he make a finding that she had an inability to pay? Or that... Your Honor, wait. Your Honor, that... No, he said that he was applying in re marriage to Schneider and said that under Schneider that, yes, that there was an inability to pay. Schneider requires an inability to pay or you must show that paying will undermine the individual's financial stability. Did he make either one of those findings? He did. He said that it was based upon the status of her accounts as they were at that time. And the accounts showed a diminishment based upon the fact that she had spent $160,000 since the dissolution in alert. Which one of those findings did he make, Ms. Doudna? Was it she had an inability to pay or that it would... Because those are the two criteria that's outlined in Schneider. Which one did he make, if any? Well, it's our reading of Schneider that inability to pay encompasses both of those.  I want to know what the trial court said. The trial court, if I recall, Your Honor, I'll have to take a look again at the, specifically at the order. No, no, I can do that myself. All right. Any other questions? No. Okay. Thank you, Ms. Doudna. Thank you very much, Your Honors. Thank you. Good morning, Your Honors. Good morning. May it please the Court. State your name again, Counsel. Leon Finkel with Berger Schatz, along with Peter Sullivan, on behalf of Donna Tukey, the appellee. Your Honors, I have been representing Donna Tukey from the beginning. I represented her in Huey 1. I argued the appeal in Huey 1. At the oral argument on the prior appeal, Mr. Huey's appellate attorney promised that if the court was not going to limit its permanent maintenance award, Mr. Huey would be back to seek modification of the award. Three years later, Mr. Huey filed his promised petition to modify or terminate maintenance. David's petition to terminate or modify maintenance requested complete termination of Donna's maintenance or, on the alternative, a significant reduction. During the course of the hearing on the petition for modification, he also filed a motion to reduce maintenance temporarily pending trial. The court had already reduced her maintenance from $35,000 to $32,500 without prejudice, but Mr. Huey suggested to the court that it be reduced to $12,500 per month. Donna Huey, Tukey, had no alternative but to litigate this matter. After 21 days of trial, 192 exhibits, expert testimony from both sides, and David's cash flow. Mr. Finkel, what efforts did Ms. Tukey make to become self-sufficient? First of all, Judge, she attempted to run the business known as Alert. There's a lot of evidence in the record that suggests that Alert was almost a hobby. It was more like an amusement for her as opposed to a business. Are you seriously contending that that's the effort she made to become self-sufficient is to operate Alert? That was one of the serious efforts that she made, Your Honor. Okay. What else? Counselor, I'm sorry. Judge, didn't she admit that she knew Alert wasn't going to succeed? That's why she was in the effort of selling it at the time of the hearing. Let's keep in mind, this was only three years after the entry of the judgment, and we're talking about permanent maintenance. No one told Donna Tukey, this is what you need to do within the next three years. Essentially, Mr. Hiroy's position is sandbagging Ms. Tukey. We have the Henke case, Judge. Mr. Finkel, what we'd like you to do is answer the questions that we have. Yes, let me get back. I apologize. Can you answer Justice Conner's question? Absolutely. I'd like to speak more to what she did with regard to Alert, but to answer your question directly, she also inquired with regard to law librarian positions. Once. Right. Because, as found by the trial court at the trial level, she had been out of the field for almost 20 years. The technology had passed her by, and she came to realize after conferring with many people in the industry that this was not a viable means. Now, at the time of the hearing. Did she make any effort to, you know, people get changed professions. That's right. Or get retrained all the time. That's right. There's some evidence in the record that she made an effort to become trained as an income tax preparer. Exactly. Okay. And she did that. What was that about? That's exactly what she did. Although, outside the record, that's exactly what she's doing right now. She started a career at H&R Block. Is that reasonable? The pay for that was $9 an hour. This is a woman who was getting $35,000 a month in maintenance, and she's seeking a job that pays her $9 an hour. Is that reasonable, do you think? It was reasonable because it was the beginning of a new career, and she had to start someplace. She's 61 years old. Her law license she never used except as a law lawyer. Counsel, this woman doesn't sound so old to me anymore, so be careful. I hear you. I hear you, Your Honor. But she had a law license. She had a law license that she had never used. Oh, but she was a lawyer. If Your Honors, I'm sure, know what the legal field is all about, and she has pursued all kinds of things in an attempt to improve her situation. I don't think we should criticize her for attempting to become a tax preparer. I think we should commend her for taking that role and trying to pursue it and not to cut her off after three years of permanent maintenance and say you haven't done what you're supposed to do. Mr. Finkel. Yes. Let's be practical here. Awarding permanent maintenance is not the usual thing to begin with. I think we can agree on that. Usually there is awarding permanent maintenance at this level, $35,000 a month, I think we can all agree that that was a good thing for Ms. Tukey. Does she have any obligation to try and become self-sufficient by reasonable efforts? And what determines what's reasonable, I guess the trial judge gets to determine that. But because we're looking at this case on review, I'd like you to explain to me what those efforts were that you say were reasonable. There were three efforts, Judge, one with regard to Alert. Let's not lose sight of the fact that at trial, Mr. Herold argued that Alert had a value of $100,000. The court found that Alert could pay Donna $10,000 to $20,000 per year. This was a very prestigious publication that Alert put out. It's used by the United States Supreme Court. It's used by the Illinois Supreme Court. It was dear to Ms. Tukey. It provided value to the family in terms of tax write-offs. And she did put her all. And she increased and stepped up her efforts. Okay, but the record is pretty clear that it was very clear to Ms. Tukey that that wasn't going to be the vehicle to self-sufficiency. So after she made that determination, what else did she do? Well, I have to disagree with the court that she didn't make that determination until she put in those efforts and put a couple of years into a business that she had been running since the late 1980s. Well, what was her income from that business, counsel? It was minimal, Judge. But she was trying to turn it around, and she was trying to make income from it, a business that the court found could pay her $20,000 a year, a business that Mr. Hirai suggested was worth $100,000. But in addition, and I'm just repeating myself now, in addition. Don't do that. You'll use up your time. Well, I want to answer your question. The library thing won. She went to one request for one law library. What else? And she began a new career as a tax preparer. Those are the things that she committed to doing. Counsel, she actually has three personal assistants. She had a cleaning lady and two personal assistants. Is that right? No. That's what it says in the brief. Well, I don't believe that's correct, Judge. She had a personal assistant. Shirley King was, I think, a member of a family. But she got paid. Didn't she get paid? And she made the choice with the money she was receiving to keep Shirley King. I don't know their names. I'm just saying she had three people. The other assistance was she had an assistant at times to help her with her move into her new home. It wasn't a regular assistant situation. And did she have a cleaning lady? She may have had a cleaning lady. I really don't recall. Your opponents misstate that in their brief? They claim that she had three assistants, you know, three people that were in her employ. And I think her children are adults, so they are not in the home. So she had three people in her employ supporting her living activities of daily living. Is that correct? It is as I just described it to you. No, you didn't describe it to me. That's why I'm asking you. She had Shirley King, who was her personal assistant, who was her regular personal assistant working, essentially full time. She had a cleaning lady come in, and she had someone help her from time to time with various tasks. Says three people. So the answer is yes, she had three people. I never said no. I just said that let's characterize properly what she had. And let's not criticize her for how she decided to spend the money, the $35,000, because that $35,000 a month after taxes. Counsel, I'm asking questions, not criticizing. Please be careful how you phrase that. Oh, I'm sorry. I wasn't suggesting that you were criticizing her. Please don't take it that way. Doesn't that reflect on the reasonableness of her activity to try to find employment or get income? She had three people she's paying. And even with those people paying those folks, she could only do three things, keep the paper going or the alerts, and look for one law library job, and then try to become a tax preparer. In three years. The alert was almost a full-time job, and she kept it going, and it was still going at the time of the hearing. I mean, the fact that she lost money, and at worst she can be criticized for exercising poor business judgment, and now she's trying to turn herself around. And that's the stage of where she's at. She fully admitted to the court that this is not working. I need to do something else. I'm trying to sell it. Doesn't look like law library situation is going to work out for me. I've consulted with friends. I've looked into different positions. I'm not qualified for them. And now she starts and embarks on a career as a tax preparer, not knowing that she even has such a burden within three years to have rehabilitated herself. And in terms of a... So, may I continue? Yes. I think it's important to point out the difference in the financial ability for Mr. Heroy and for Donna Tukey. I think it's also important to point out... And what is that in relation to which issue are we talking about? More of the attorney's fees, but I think it does... Okay, since we're moving to the attorney's fees, what is the standard that is required under Schneider for payment by Mr. Heroy of Ms. Tukey's attorney's fees? What's the criteria? I completely agree with Your Honor's articulation that undermining one's financial stability is the standard. No, I didn't articulate anything. I asked you what is the standard. That is the standard. Inability to pay to the extent as defined by undermining your financial stability. And how is undermining one's financial ability, how is that determined? Based on what? In this case, it was based on the fact that using retirement funds, which the court characterized as saint for a saint, would undermine her financial stability because the day will come when Donna... How much is left in the balance due to her attorneys, Mr. Finkel? What's the remaining balance of attorney's fees for which she is obligated to pay? Today? Well, whenever you file the brief. What was her balance on her attorney's fees? I don't recall. Okay. She gets $27,500 a month, and she has liquid assets of about a half a million dollars. Are you saying that she couldn't pay her own attorney's fees? Yes. First of all, her income of $27,500 a month is reduced by taxes to something under $20,000 a month. Secondly, she didn't have $500,000 in liquid assets unless you're characterizing her retirement funds as liquid assets. Her investment account... Let me ask another question. The trial court took into consideration the fact that her liquid assets were reduced by her decision to prepay her mortgage by more than a half a million dollars. So that reduced the amount of assets. That certainly left the amount of money that's available to her to pay. As your opponent says, that's financial. Your opponent characterized that as financial gamesmanship. What's your response to that? Donna is simply trying to secure her future so that she has a home that she can live in. She went from living in a 7,200-square-foot home at 2450 Lakeview, having a second home at her disposal in Michigan. Now she doesn't have a second home. Mr. Heroy does, because she can't afford it and he can't. Your opponent keeps saying you're using the standard of comparable ability versus inability to pay. And, you know, it sounds like that's what you're doing. And the standard is the inability of one party to pay versus the other party's ability to pay. It doesn't say who has the most money. Does Mr. Heroy have more money than Ms. Tukey? I think we can all agree that that's true, but that is not the standard. Tell me why Ms. Tukey is unable to pay her own attorney's fees when she gets $27,500 a month, she has assets approaching, you say it's less than a half a million, but it's about $300,000. She can't pay any of her own attorney's fees? Is that what you're saying? First of all, that $300,000 was completely expended as a result of owing David Heroy $70,000 for retroactive maintenance as a result of the attorney's fees that she had to pay because we stipulated to a fee, a reasonable fee of $345,000 for purposes of a contribution hearing. Her fees were in excess of $345,000. She paid all of that, and she paid the difference between $125,000 and $345,000. Her investment account at the time of the motion for fees to defend the appeal was down to $90,000, and she hadn't paid the $70,000 to David Heroy. So the only things that Donna had to pay fees were with her home and her retirement money and her personal property. But she had three assistants that she was paying to support her lifestyle. But that's a minuscule amount of money compared to the fees that we're speaking about. And to answer the court's question with regard to inability to pay, we can't look at this in a vacuum. You have to look at it from the perspective of what does it mean to undermine someone's financial ability. You have to look at what was that person's lifestyle and what is her future in terms of her ability to pay for her future going forward. There's no question that if Donna Tukey had to pay another $125,000 plus $35,000 in fees, that it would greatly impact her future. She would either have to risk losing her home or refinancing her home, increasing her monthly expenses for her mortgage, or she would have to take money out of a retirement account that Judge Jacoby has appropriately characterized as saying, given the fact that this is what she needs to live on going forward in the future. Counselor, can I ask you, as far as the hearing, what testimony were you able to elicit from Mrs. Tukey that this wasn't gamesmanship on her part? That was brought up during the hearing, wasn't it, that she did this to avoid? She testified that she did so to secure her future. First of all, she didn't have the money available to do it much before she did it because she was getting money in chunks from Mr. Heroy since the time of the divorce. And so she had the financial ability to do it at that point, and that was her plan was to be able to maintain a home that she could afford to live in forever. And how did she pick this dollar amount versus any other dollar amount to prepay? Based on what she could afford to pay under the amount of maintenance that she was receiving on a monthly basis. I want to point out to the court as well that while Mr. Heroy was very critical of Donna's spending, the thing that killed Donna was she spent, since the date of the judgment for dissolution of marriage, $1.1 million in attorney's fees. $600,000 for the underlying case, and another $500,000 for post-decree issues, including the 21-day hearing that we're up on appeal for today. $1.1 million. He's already undermined, Mr. Heroy has already undermined Donna's financial ability because she's had to litigate to the extent that she's had to litigate in this case at every single term. And when you look at their financial ability, I don't think we can, obviously you're not ignoring Mr. Heroy's ability, but there is no question that he can pay. There's just no question about it. And when you look at what her net income is at about $20,000. You make that point often, so it suggests to me that you think the standard is, the fact that he has more money than she does is the criteria, and that's not the law. First of all, it's part of the law in the sense that he has to have the ability to pay. The fact that he can easily afford to pay is the law. I also believe that the court, well, applied a tougher standard than the court should have applied under the Schneider case. You're kidding, right? No. Because Section 508 provides, and under 503J, that the factors under the maintenance statute are what the court is to apply in a maintenance situation. But I have no problems with the court's finding that under Schneider, she qualified for fees because it would vastly undermine her position. If all we're doing is providing a recipient of permanent maintenance with the obligation to pay hundreds and hundreds of thousands of dollars in legal fees, what use is there to her permanent maintenance award? It will absolutely undermine her financial ability. This isn't about I'm going to save $2,500 a month out of my award of maintenance so I can pay fees. Mr. Finkel, please wrap up your remarks. Can I ask one final question? What's the standard of review on this fee issue? It's absolutely abuse of discretion, Your Honor. The court specifically said it applied the Schneider case. The Schneider was abuse of discretion, was it not? Right. And so was C-11 was abuse of discretion. Just in conclusion, Judge, just a couple of points I haven't had to make. There is no question that the Judge Jacobius did not make a mathematical error. He specifically stated that using David's numbers, that the amount of maintenance of $27,500 a month approximated a third of his law firm income. But he had another, in their own expert's testimony, another $345,000 of income that wasn't related to his law firm. That's the 25%. But the Judge wasn't trying to arrive at a 25% number. What Judge Jacobius made very clear is that he followed every factor. He paid attention to her. He never said that she didn't have an obligation to rehabilitate herself. He found, based on the facts, that she was doing what she was supposed to be doing. And again, I say under the Hankin case, Your Honors, that even in a rehabilitative maintenance situation, you have to tell the recipient, this is what we expect of you, to be blindsided like this. Three years later to say, sorry, you lose because you had three years and you haven't rehabilitated yourself, would fly in the face of this award. Thank you, Your Honors, for your consideration. Thank you, Mr. Finkel. Ms. Jochner, brief rebuttal, please. Emphasis on brief. Your Honors, thank you very much. Your Honors are completely correct that Mrs. Tutukay had three people living in her employment. It was Shirley King, she had a cleaning lady, and she also had a personal organizer. And we note that all of her employees earned more than she did. Your Honors also asked about her efforts. There were none. There were no efforts, not less any reasonable efforts. The record reflects that she is a highly educated person, but wasted $160,000 on zero value, on a zero value company called Alert. And Alert was valued at zero at dissolution, has always lost money for 80% of the time that it's been in existence. She testified even that she admitted that her loan to Alert was money that she probably had lost forever. And that's volume 13, page 10. That shows that she knew what she was doing here. Again, inter-marriage accounts connect, controls here, the IMDMA does not contemplate that the payer should subsidize a payee's failing business. She also had made no job search efforts at all. She was 56 years old at the time of the dissolution in 2006. She had a good 10 years of work experience ahead of her, but she did nothing. She applied for no jobs, made no efforts, did not have a current resume. Your Honors, it was only after Mr. Healy filed his modification petition that minimal efforts were made, but they were very transparent. She clicked on the SeedBurger website and then she decided herself that she was not going to go any further with it. At volume 21, page 22 and 23, she stated while she looked at the SeedBurger skills inventory, she never completed it or sent it to them. She felt she could not check enough boxes, so she decided not to do it at all. She had a referral from Judge Shields. She took over a week to respond to that and said, well, when it didn't come back, I guess I wasn't qualified. She has never tried. I go back to the old adage that the lottery have. If you don't play, you can't win. Well, the same thing here. If you don't submit your credentials anywhere, you cannot get a job. And this is what happened here. She did not try. And Mr. Finkel talks about the H&R Block. Well, those efforts are not commensurate with her experience as having a Master's of Library Science and also a JD. But what the H&R Block experience does show your honors, it shows that she is capable of retraining. And she actually has done it, but she's done it somewhere that's totally inappropriate. She testified at volume 19, pages 15 to 22, that she went through an 84-hour program at H&R Block. Our question is why could she not have done that in terms of her librarian skills and gotten up to speed on what she needed to so that she could actually fill out that SeedBurger website questionnaire. She has made no efforts at all. Can you speak to the attorney's fees issue and then wrap up? Yes, Your Honor. Again, as Your Honors pointed out, what opposing counsel repeatedly states is that there is a comparative ability to pay here. And that is not the standard under in re marriage of Schneider. And it is an inability to pay. And we submit that after she paid her fees to opposing counsel and after she moved $500,000 into her home equity, she still had nearly $3 million left after she did that. And that cannot in any sense of the word be considered an inability to pay. And we just want to highlight that to you. And finally, Your Honors, we also want to note that the personal tax on Mr. Heroy, on his alleged litigiousness, all of that is beside the point. We have legal issues here. That's all meant to distract Your Honors from what's actually at issue here, the two legal issues that we bring up. They're not very distractible, Ms. Cross. Well, I am very glad to hear that, Your Honor. But I just want to make the point there is no finding has ever been made by the lower court that Mr. Heroy is litigious. There is no finding ever. Nowhere in the record will you find that. That comes from the other side. And, again, it is meant to distract. And, Your Honors, we very much appreciate you taking the time to hear us today. And we ask that you reverse and remand this case to the circuit court for further proceedings. Thank you. Thank you both for a spirited argument. This case will be taken under advisement. Thank you.